Good morning ladies and gentlemen. We're very pleased to have Judge Paul Meyer of the Northern District of Illinois sitting with us as a visiting judge today. So our first case for argument, United States v. Smith. Let's see, Mr. Krishnamoorthi. Good morning, your honors. May it please the court. Guha Krishnamoorthi of Munger Tolles and Olson for defendant appellant cross appellee Terry Joe Smith. I'd like to focus my attention on the evidentiary issues governed by Rule 701 and Rule 702. The district court here erred in admitting as lay opinion testimony, officer testimony, that Smith's exercises of force were unreasonable or excessive. This error requires reversal of the convictions on counts two and three. This case is precisely the kind of case that Rule 701 and Rule 702 were meant to protect against. Due to the nature of the circumstances and force exercised, the government wanted and needed witnesses with the imprimatur of possessing specialized knowledge about law enforcement exercises of force to tell the jury that this force was objectively unreasonable. But if the government wanted that evidence in, the district court should have required the government to go through the procedures attending Rule 702. The district court failed to satisfy its gatekeeping function of ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of the proffered experts. So on count two, we have four officer witnesses testifying based on specialized knowledge that Smith's exercise of force was unreasonable. Here, the specific nature of the reasonableness question... What do you mean by specialized knowledge? Couldn't just an ordinary lay person say that force used was excessive? So in particular here, we have two officers testifying based on their training that the exercise of force against Warren was unreasonable. And that training, so with respect to... Suppose a lay person had observed the incident. Couldn't the lay person say, wow, there's no basis for, you know, punching this guy? A lay person may have been able to make that determination or may not have. I mean, there's a risk profile here that the officers gave their opinion on. And so the risk profile is you have objective noncompliance to some degree by both Warren and Land. So you have the officers testifying based on their specialized training what kind of risk that posed and what kind of level of force was appropriate given that risk. But do you think this question would have been okay? Officer A, based on what you observed, did you believe you would have been justified if you had punched the suspect? So here... Do you think that would have been okay? Because that doesn't call into account specialized knowledge. I think that that question is tricky. I think the answer is no. And I think the reason is because the specific nature of the reasonableness question here posed to the officers calls them to bring their training and their expertise from outside the instant case to answer that question. So I think the nature of the question itself brings Rule 702. So you don't think the officers could have asked why they personally didn't use force or wouldn't have used force? Well, if they were asked simply why they personally didn't use force and they gave an explanation for why they didn't, that may be similar to the case of Hicks and Orieta where they're talking about their mental state or something like that. So that would have been okay? Yes, it could have been okay. I'm not exactly sure. It depends on what the nature of the question is. I mean, if the nature of the question is asking them to place themselves in the shoes of Mr. Smith, that I think may, again, draw upon their expertise and their training from outside the instant case. And therefore, under the cases in this court, Cheeks, Moorland, Rawlins, that would be expert testimony. Well, what's the basis for concluding that this was really significant to the jury? Here's why I'm asking, Mr. Krishnamoorthy. My understanding is that similar testimony was given with respect to counts one and four, and we know the jury acquitted on those counts. So one might draw the conclusion they didn't really pay a lot of attention to that testimony, they paid attention to the facts. And these facts, as I understand them on counts two and three, are pretty egregious. Yes, so we think it's a mistake to look at the other counts. They had different facts. And so how egregious the behavior there was is just, it's really outside the scope of determination of counts two and three. But we only need to look at the government's own arguments to know how significant this testimony was. So the government on four occasions in opening and closing argument emphasized, for example, in closing, they were all trained in the use of force. They all stated that T.J. Smith used excessive force. And they said that with respect to counts one and four. I'm sorry, the prosecutor made that comment with respect to counts one and four as well, right? Sure. So one other issue with looking at the acquittals in counts one and four is there is a real possibility of a compromised verdict here. So there were four counts, and then you had two where there were acquittals and two that were convictions. So it's difficult to look at what, you know, to read into the minds of the jury. But the test on harmlessness is in the mind of the average juror. And given the prosecutor's emphasis on this testimony, and the nature of the case itself, I mean, we have objective noncompliance by the two arrestees. Some level of force is called for, and we have some exercise of force. So, you know, the officer's professional judgment, the testifying officer's professional judgment I think would have been impactful to the jury here. So what would you expect, if they had been classified as expert witnesses, what would you expect the, what, you envisage a Daubert hearing? So what would that be like? Well, one thing I think is, you know, there's nothing... I mean, these are not, these police officers are trained, but they're not like scientists and so on. They're not possessing, you know, really esoteric knowledge. Well, so I think, you know, one point here is we look at Chad and Hallam's testimony, and both of them explain rather non-obvious propositions. So first, you know, Chad testified that you could only use a punch in a deadly force situation, fighting for your life, if somebody was absolutely physically overbearing you, if they've got some weapon of a type, a club, or choking you out. Hallam testified that if you were to punch somebody in the face or anywhere outside of what we're normally trained to do, that would be almost lethal force. Both of those are non-obvious propositions, and there's nothing in the record to indicate... unless they're in a desperate struggle. Well, what constitutes, you know, a deadly force? I mean, that's ridiculous. Do you think a police officer would come up to someone and just punch them in the face? Well, of course, there are situations where nobody should use that kind of force, but... Well, and do you need a Daubert hearing for that? Well, we just... Do you need a Daubert? You just gave an example there, a situation which is obviously obsessive force. So does that mean you need a Daubert hearing? It's obviously obsessive. Why do you go through that rigmarole? I think we do need an opportunity to determine the nature of the training that these officers were testifying based on, and, you know, what... if they were qualified to give such opinions. Because, you know, again, these are non-obvious propositions. No, it is obvious. The police officer just walks up to someone and punches them in the face. In that situation, it would be obvious, but that's not what manifests here. We have... I don't know. It looks very close here. We disagree. That's what all the police officers testified, so... Well, police officers testified that, even under the police officer's testimony with respect to Warren, what we have is we have testimony that his arms... below the arms, so his arms were free. And because his arms were free, you know, he posed some risk to the three officers that were unable to restrain him around him. And so the physical... the risk that he posed to the other officers merited some kind of force. And the question really is whether the force that Smith exerted was reasonable. Now, when we talk in count three, we have an officer testifying, but he didn't even see the force exercised. But he heard it, right? No, he didn't hear it. A couple of them heard it, and one turned and observed the damage after it was done. So Biggs testified that he did not hear anything to merit the force exercise, but he didn't hear him being thrown. He just saw land midair. He didn't know that he was thrown, and he didn't know what may have precipitated that force. So on his own, based on his own perceptions, his determination that his opinion that the Smith's force was excessive or unreasonable just didn't satisfy Rule 701A. So then I would just go to Rule 701A again, you know, on count two, we have three officers testifying that Smith's force was unreasonable, but they didn't even see the punch. And they all determined that Smith had punched Warren based on hearing it from others. And actually Smith himself saying, you know, I punched him. So in such a case, their opinions that Smith's force was unreasonable in punching Warren was also not based on their, was not limited to their own observations, again, in violation of Rule 701A. So you're saying it's hearsay? Well, we're not sure. So, you know, it would have been, it looked like that their determination that Smith had punched Warren was based on just them hearing it from Smith or Warren. So it just, it wasn't limited to, you know, it wasn't an opinion that was limited to one that was rationally based on their own perceptions. But it also didn't rely on expertise, correct? Oh, no, it did. You think it did? Yes, we think it did. So there are two issues there. So there's a violation of Rule 701A in that the three officers on count two testified that Smith's and Warren was unreasonable, but they didn't see the punch, the one that did. But I thought your, I thought your argument was not that they didn't, that they didn't have a basis to observe this, but that they, that they should not have offered expert testimony about whether it was improper. It's both. So we bring a Rule 701A issue and a Rule 701C issue. The Rule 701C issue is that they testified based on expertise. And the Rule 701A issue is that three of the officers, the fourth officer did see it, but the three of the officers didn't see the punch itself. And they were cross-examined on that. Yes, I believe they were cross-examined. Vigorously. And the jury was also instructed, weren't they, that they were not to give any greater weight to the testimony of the police officers. Sure. And so the jury instruction, that was jury instruction number 13, simply says the fact that a witness is a law enforcement officer doesn't mean that their testimony necessarily deserves more or less consideration or greater or less weight. But that doesn't address the issue, either the 701A or 701C or the 701B issue, which is, at least on the 701C issue, these people are testifying based on their training and their specialized knowledge. The jury instruction doesn't really address the fact that they are, you know, testifying based on this specialized training or knowledge. And, you know, the jury instruction doesn't obviate the requirements of Rule 701A. What do you mean by specialized knowledge? They taught in police school not to punch people in the face or what? So, again, here, you know, I don't know what the nature of the police training is. That's part of the problem. But the police training, I surmise, has a lot to do with assessment of risk and what kind of force is proportionate to that risk. Again, we have two arrestees here who are noncompliant. And so I find it very hard to imagine a situation in which punching a person in the face is an appropriate police act. It just doesn't seem like a way of getting, of restraining the person. It just seems like a basic assault, a punishment. I'm going to hit you in the face. It's going to hurt. That's not like grabbing the person's arms or restraining his flight. Well, here we had, you know, three officers attempting to restrain Warren by the hands and they couldn't get him handcuffed. Then we have one use of force, one punch to the face, and immediately he's handcuffed afterwards. So, you know, the exercise of force, you know, the question is whether it was reasonable. And, you know, it did accomplish the goal of getting him restrained in handcuffs, which is what all the officers were trying to do beforehand. And the exercises of force that the other officers were engaging in wasn't able to accomplish that goal. So, you know, this is unlike the other 242 cases where we have, you know, multiple strikes to the head for, you know, a person is completely secured in handcuffs, in the jail, in the holding cell. This is where you have objective noncompliance and a non-completely secured individual who poses some risk to the other officers in the case of count two. And then in case of count three. Of course, this is echoing that case in New York where they kill a person because they're having difficulty handcuffing him. You know, sitting on him or something, sitting on his chest. You know, I'm not familiar with the facts of that case. Well, I can imagine punching in the face being an appropriate police action. So. So do you think it makes a difference whether it's a closed fist or a slap? I think that does, that, you know, may matter. I mean, it seems like a closed fist could be worse than a slap to the face. And here we had officers testifying without actually seeing the punch itself that, you know, they just assumed that it was a closed fist. So, you know, that again is, just points to the Rule 701A issue. These officers were giving an opinion about whether the force was reasonable without actually having seen the exercise of force. Let me ask you a question about the sentence. So the judge gave a sentence that's below half the guideline sentence. And I don't see where he gave any reason for such a drastic dip in the sentence. Well, I think that's incorrect. I think the district court judge gave plenty, many reasons for why such a departure. No, he didn't give many reasons. Don't be ridiculous. So one point is that the district court sentence was in accord with the PSR recommendation to give a downward variance. A downward variance from, what, 33 to 14? Well, yeah, so the... Is that what the probation service suggested? PSR didn't give a particular recommendation. Yeah, okay, so they didn't. So then, you know, we look at the instructive cases. I think the instructive cases are really useful here. You know, the instructive cases all involve much more egregious conduct, multiple strikes to the head. What is the reason for such a dip? So, again, I think that there are multiple reasons, one of which... Well, give me one reason. Sure, one reason is that the district court determined that Mr. Smith was unlikely to be a re-offender. Well, why does he say that? Well, there are a couple of reasons. One is that he was not going to have the same position being an officer, so, you know, he was going to be fired. And then the other reason was that the district court determined that one of the main issues... Wait a minute, he was going to be fired and he would never be hired as a police officer? Yeah, I think that was... How do we know that? I guess convictions on excessive force, likely to ensure that he doesn't get hired as an officer again. And in terms of, you know... There was nothing, though, in the sentencing judge's order to say that he could not, he was prevented during the course of supervised release from becoming a police officer or security guard or anything like that, that wasn't in the order, was it? I don't think so. I think Mr. Smith, in his sentencing hearing, indicated that he was going to become a plumber and was not going to be involved in law enforcement again. And then the other point was that, you know, the district court determined that, you know, Mr. Smith's offenses were a product of his anger management issues. And, you know, corresponding to that, district court ordered that he be put into anger, enroll in anger management program. What's anger management? I'm not sure what the nature of that program is. Well, isn't that rather important to know what it is? It's just not in the record what the... Well, I... What that is. Did the judge say what is anger management? No, the judge didn't say that. Well, how does the judge know whether anger management is suitable for a person who seems so out of control as this guy? That is not revealed. That's a critical part of the sentence. It doesn't have to be explained. Sure. You know, the probation department has... Well, apparently nobody knows what anger management means. I am not certain that nobody knows what it means. You don't know. It's just not in the record. Well, you don't know. I don't know what it means. Yeah. Well... And the problem is the judge didn't tie that. Like, you've listed different things that could perhaps justify a lenient sentence. But the judge didn't tie it to the sentence. The judge just sort of repeated boiler point... boiler language by saying the sentence is a downward variance based upon the history and characteristics that Smith presented, as well as the nature and circumstances of this offense, which is... doesn't tell us a lot. Doesn't tie those specifics. I disagree. I'm not sure what more tying is required. You know, the district court set out many of the reasons that support a lower sentence, including, you know, Terry Joe Smith's involvement in the community, the fact that he's a hard worker, the nature of the offense conduct itself, you know, posing difficulties for law enforcement officers, all this together. And I think also, you know, as a matter of substantive reasonableness, if we look at the cases cited by the government itself, I think they are Hootchin, Cosette, and Evans from other jurisdictions. Those involved sentences of 12 or 14 months. And they also involved more egregious conduct than Smith's, you know, multiple strikes they had for no law enforcement. Yeah, but here the judge talked a lot about the offense and problems with the offense. And one, reading it, one would think that he was going to conclude that a higher sentence would be warranted. But he, not the low one that he said, not the low sentence that he gives. So, you know, you set it out, but then you have to say why you're persuaded one way or another, in terms of how that affects the sentence. So, here I think the district court set forth that the offense conduct was in a kind of difficult situation, involving fleeing suspects, reckless suspects. And so I think that the district court description of the offense conduct indicated why a downward variance was warranted. Let me give you another example. The judge stated that Smith had already lost his job and reputation, but then he also said that those were the consequences of every criminal conviction. So that, to me, that doesn't justify the lenient sentence. Sure, but the, just the holistic view of all the 3553A factors, I think, does justify the variance. In particular, you know, the five instructive cases, I think, are really useful, because they have conduct, you know, that's just far exceeds whatever happened. And so the judge said he looked at those other cases. He said they were instructive. Those cases all had higher sentencing, but the judge didn't explain that either. I mean, he said they were instructive, but he didn't say how they were instructive. He didn't explain that. Here I think that, you know, the nature of the descriptions of those cases make clear why they were instructive. But I think it's useful to say here also, in terms of the adequacy of the explanation, we're on plain error review, because, you know, the government had two opportunities to object to the description of the sentence if it was not clear on what the district court's explanation meant, and it did not object, and so it forfeited the adequacy of the explanation. Okay, well, thank you, Mr. Christian-Murthy. I'll give you a minute to rebut it after we hear from Mr. Wood. Your Honor, may it please the Court, Bob Wood on behalf of the government. I would just start by saying, addressing as he did the 701 testimony, officers can provide 701 testimony that's based on their experience and training. This Court said as much in Moreland and Cheek, several other cases. Perkins, obviously, is the closest, but it's not from the circuit, to what we have here. The Court, all three judges of the panel raised a lot of the issues that the government was going to raise in response. The main one that I'd like to respond to right now is the risk profile, risk assessment issue that he brought up, that Smith brought up, and I think that's based on Smith's view of the facts, which aren't really consistent with the verdict and most of the evidence. The officers, all the other officers said, we had his arms, we had his legs. This is for Warren, in particular. He was apologizing. He was passive. He was not aggressive. There was no need for any force. There's also a little bit of a timing issue on this question of some force was necessary at some time, and officers Troyer and Bowler both said, yes, we needed to use force when Warren was in the truck, and then we handed him down, and then it was good to go. And then the new time enters. That's Smith time, and that's when no force is necessary at that point. They're holding him down, and Smith punches him in the face, and smack or punch, you know, whatever. I don't see how training, I mean, you might have on your first day of training, hey, everybody, just for the record, let's not do this kind of thing. But I thought about, at first I thought, oh, he's kind of right. It's a non-obvious proposition framed in terms such that you only punch someone in a deadly force situation. But then I thought, when have I ever heard of a police officer punching someone and not getting in big trouble for it? And so anyway, I think that is an obvious proposition, maybe not in those strict terms. But just going back to the point that experience is fine, it's important to distinguish between experience on the one hand and expertise on the other. Well, what was the point of asking the officers whether Smith's conduct was, what was the point of, if special training, because your position is special training, wasn't necessary for their opinion, well, why did the prosecutor keep asking them about their training right before asking their opinion on whether Smith's conduct was reasonable? Sure, Your Honor. I think, first of all, I'd separate out two out of the five officers were asked about training. So that makes, on the premise of Your Honor's question, those two a little more problematic than the other three. And who were those two just revealed? The ones that were asked? Hallam and Chad were asked. Hallam said he had received training that was relevant to that. Chad did not. Chad then proceeded to say, in essence, I suppose you might punch someone only if you were desperate. But that wasn't based on his training. It was sort of tangential to his training, I guess you might say, or common sense. And how does that testimony compare with what was given with respect to counts one and four? Counts one and four, the reasonableness questions were basically like, they were more like the question asked Officer Biggs on land. It was just, there was no training. No reference to training. There was no reference to training there. And those officers, if I remember correctly, the training officers weren't on the scenes of the others. So I don't think that they could have tied back into their training through that testimony. So that was more like the three that you might say, even though the government's views, they're all acceptable. I understand you could draw a distinction. Some is more acceptable than other. And that's the training. And I think what the prosecutor was trying to get at, first of all, I think the prosecutor, who was also the prosecutor in the Moreland case, firmly believed this notion that if you're experienced and you have training in something that is not a matter of expertise at all, then it's okay to talk about that, like Claret says, which the government cited in its 28J letter. And so I think maybe the prosecutor was reaching out to the line where he thought these questions were permissible. And he knew that Hallam was the only one who had received such training through trial preparation. So he decided to ask Hallam that question. But really, I would just say that he equally knew that when he asked Chad, Chad would say, I received no such training. So equally, the point of it was to show that not all officers are trained in this sort of thing, that it isn't, that even though we have one here who is trained in it, it's not necessarily a matter that all officers get trained in, rather than leaving it to the jury to imagine maybe all these officers have some kind of strange training about it. When maybe the argument, whether they're trained or not, they knew this was not appropriate. Whether they had received specific training. I think at the time, in my discussions with the prosecutor on this, at the time it fed into that notion. And then, you know, that wasn't something that he articulated or that she, the other prosecutor, articulated as such in closing. But at the time they were trying to set up that dichotomy. But then they didn't quite articulate it that way. So 701 says that the opinions have to be helpful to clearly understanding the witness's testimony or determining a fact and issue. How did the officer's testimony meet that requirement? Sure. Given that it was more common sense certainly would dictate this was not appropriate. Absolutely. Well, the officer's testimony was helpful because they were officers. And in a sense, they're not experts, but they were on the scene, and obviously the jury is hearing from these officers and they're thinking, well, one officer did something quite a bit different than the others. And we have varying testimony about whether, for example, Warren was compliant or noncompliant. And I think that's the key issue that this is helpful on. I mean, I wouldn't say that a punch to the face is right for a noncompliant arrestee, but if he was compliant, then nothing, no force at all was necessary. If he was noncompliant or aggressively resisting, and this is the factual issue, then something was required. And getting the officers, because if you look at the way they answer the question, why is it that you say this was unreasonable? They say, to me, I just wouldn't have punched him. I wouldn't have punched him because he was just sitting there apologizing. I don't think that's the right thing to do, you know, stuff like that. So they answered in a very factual way. They weren't saying this is unreasonable in some 10,000 feet kind of objective way. They were saying it was unreasonable, and let me explain, by kind of tying together the facts that I've already given you, this big bulky story that I've told you because I was there, this final question kind of ties that together as to why I responded this way, whereas in my view, well, I mean, I responded this way, which I think was the right thing to do, and my opinion as an officer who was on the scene is that the way Officer Smith responded wasn't reasonable. And it's not a legal conclusion kind of thing. I understand the impulse to say, well, that he uses the word reasonable and the standard uses the word reasonable force or excessive force. It seems like a legal conclusion kind of testimony leading the jury to a certain answer. This isn't like Noel where the term used is child pornography. I don't think I've, I hope not, I've ever used the term child pornography in everyday speech, but I probably use the word reasonable excessively. And those are just common words, and I think that Perkins got it right on this question. It's a close call because if they had said, used the word reasonableness in a way that was, that reflected objective reasonableness, that probably would have been a problem. But if you look at the way they were asked these questions, it was always, and the way they answered, it was always based on what you saw at the scene. And to me, I did this, I don't know, I thought this wasn't appropriate because he was just sitting there. I didn't see Mr. Land do anything at all, and suddenly he's up in the air, and then he's on the ground, and then, you know, other things happen. Anyway. So essentially your position is because they didn't sort of say, you know, as officers we're trained in a certain way when we're dealing with individuals who resist arrest. And, you know, in terms of the method we use, you know, punching someone in the face is not something that's appropriate. You try other things. They never testified to any of that. That's what you're saying. Sort of. I don't want to get confined to that position. But is there anyone? Well, go ahead. I was going to say, and I know you're talking about helpfulness, but really quickly I don't want to confine the government's position to that. The government's position is that this is not a matter of expertise. It doesn't matter the nature of the experience and training. This is not like drug code words or how narcotics are manufactured or packaged. Then you have to draw. This court has very reasonably drawn a line between this case and broader experience. Here we're talking about a punch to the face for somebody who's not doing anything. And that's helpful to the jury in this particular case because all the officers were there. They all responded in one way, and Smith responded in another way, and Smith's contention was that he responded that way because Warren and Land were acting thus and so. And that's a factual question. These officers explaining why they didn't do anything helps the jury resolve whether Warren and Land were actually resisting. That's, I think, I think I've covered the helpfulness view. Do you want to say something about the sentence? Sure. I would respond to his point about, I think, here at oral argument and maybe in the briefs, Smith's main hook for an explanation is this likeliness to reoffend. And the anger management issue, not only is it unclear, I think the judge kind of left it to probation to determine the nature of this anger management. That's my understanding of the record, which obviously there are a lot of cases recently from this court about the problematic nature of that kind of thing. But also, a lot of that was conditional, and the judge was saying, you've got an anger problem, and if you address it, then things might get better. That doesn't sound like a reason for a low sentence to me at all. And the judge was also saying, you won't be able to do this again because you won't be a police officer. He might do it again. He just won't be charged under 242. It'll be a state charge for battery. And so I don't see those as reasons. I think I don't have anything particular to add beyond the briefs as to my view of the sentence. The plain error issues, I'd like to address sort of both of them. There are these twin plain error objection issues. I don't want to be too harsh on, take too harsh a view, the government doesn't want to take too harsh of a view on Smith's objections to the 701 testimony, but there are sort of two kinds of testimony there. There's the training testimony, and there's the reasonableness testimony. And if you look at United States v. Christian, the court said, if there are these two entirely different types of 701-702 testimony, and below the objection was tied only to one type, the other one is subject to plain error review, and there was never an objection to the training testimony here. There was only an objection to the reasonableness testimony. And that was raised in the motion eliminate stage as well as that trial. It was raised in the motion eliminate stage, and then at trial the objection was raised again as to one person. And again, that's where I don't want to take too stringent a view because the attorney maybe thought that that in some fashion countered as a continuing objection, although I stand by what I said that he obviously didn't make that clear to anyone. But there really were two types of testimony. There's the training type and the reasonableness type, and there was never an objection to talking about the officer's training. And then as to the plain error review for the government on the sentence, the judge, as you can see from the transcript, the judge, I'm sure it was just an oversight, but he said, defendant, do you have any objections to what I've said? And then the defendant said no, and then the judge said, okay, this is the sentence. Anything else? And that anything else this court has said in Cunningham and Shannon came close, Shannon is probably the clearest contemplation and pondering of this issue, but it didn't go all the way. I mean, it's difficult as when you're before a court and you've had this entire sentencing hearing to say, well, hold on, judge, I know you're done, but let's do this over again because that didn't make any sense. And Rule 51 doesn't seem to contemplate that a lawyer has to do that sort of thing. So beyond that, I think those are the primary. Oh, and one other thing I'd like to talk about with 701, just really briefly. Smith makes a lot of the prosecutor's comments at closing and opening, emphasizing that these officers were trained and experienced. First of all, it's fine if they were experienced. It wasn't a matter of expertise. But in Cheek and Christian and Rollins and several other cases, this court has rejected that sort of the jurors were overawed by the experience of the officers on this subject kind of argument. And I would say that in addition to the fact that I don't see how a prosecutor mentioning in closing, stressing something in closing,  I'd also say that this court has on numerous occasions rejected the claim that the jurors are overawed just because the prosecutor stressed the experience of the officers. And I know that's kind of out of order, but unless there are additional questions, Your Honors, I'll rest on my feet. Okay. Well, thank you very much, Mr. Wood. Mr. Christian Murphy, do you have anything further? I just have a couple more points. So on the plain error question, in the motion in Lemonet, a 701C issue was raised. That was capacious enough to encompass the training and the other points, and the district court made clear that it was denying Smith's objection at trial when he raised it on the Troyer testimony. On the 701B point, I just want to say that what Noel speaks against is just directing lay witness purposes not to direct the jury on what legal conclusion to draw. And so what we have in the closing argument is here's the big picture, ladies and gentlemen, of the jury. Seven police officers have testified that Terry Smith's use of force was excessive. Excessive is the term that was used in the jury instructions. It was just a directing that the officer's testimony, you know, satisfies that, is enough to satisfy that element. So those are the two points that I had. If nothing else, then... Okay. Well, thank you very much, Mr. Christian Murphy. And you were appointed, were you not? Yes. Yeah. Well, we thank you for your efforts on behalf of your client. We thank Mr. Wood as well.